**SIGNED THIS: September 25, 2015**



_____
**Mary P. Gorman**
**United States Chief Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| In Re | ) | |
| | ) | Case No. 14-90026 |
| AMANDA COYLE, | ) | |
| | ) | Chapter 7 |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| MICHAEL W. COYLE, | ) | |
| JACQUELINE R. COYLE, | ) | |
| and JON T. COYLE, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Adv. No. 14-09013 |
| | ) | |
| AMANDA K. COYLE, | ) | |
| | ) | |
| Defendant. | ) | |

## **O P I N I O N**

This matter is before the Court for decision after trial on an amended complaint filed by Michael Coyle, Jacqueline Coyle, and Jon Coyle ("Plaintiffs") objecting to the discharge of the Debtor, Amanda K. Coyle. Because the Plaintiffs have met their burden to prove that the Debtor, with the intent to hinder, delay, or defraud her creditors, transferred property within one year before filing her bankruptcy petition, her discharge will be denied.

## I. Factual and Procedural Background

Amanda Coyle ("Debtor") filed her voluntary petition for Chapter 7 relief on January 14, 2014. On her Statement of Financial Affairs ("SOFA"), the Debtor listed several pre-petition payments to creditors, including payments made on several credit cards as well as payments made on November 25, 2013, of $25,000 to the law firm of O'Neil Cannon Hollman Dejong & Laing, S.C. ("O'Neil Cannon") and $3400 to her husband, John Geissal. On her SOFA, the Debtor also disclosed a Wisconsin state court judgment entered against her in 2013.

On her Schedule B - Personal Property, the Debtor disclosed her interest in an individual investment account held at Robert W. Baird and Co. ("Baird") with a balance of $167, two IRA accounts with Baird totaling nearly $270,000, joint ownership of a 2010 Chevrolet Malibu, jewelry valued at $459.50, and several other items of personal property. On her Schedule D - Creditors Holding Secured Claims, the Debtor listed PNC Bank as the holder of a mortgage on her home, the Plaintiffs as judgment lien holders, and Chase Auto. On her Schedule F - Creditors Holding Unsecured Nonpriority Claims, she listed the Plaintiffs and a

small credit card debt. The Debtor reported on her Schedule I - Income that she and her husband were both retired and had joint net monthly income of approximately $4500. Their principal sources of income were disclosed as Social Security and pension payments. On her Schedule J - Expenses, the Debtor listed a monthly house payment of $400 plus an additional $335 spent monthly on real estate taxes, insurance, and upkeep. She also listed a monthly entertainment expense of $400 and two car payments of $389 and $315. Total monthly expenses for the Debtor and her husband were scheduled at approximately $3800.

The Chapter 7 Trustee ("Trustee") held two meetings of creditors, the first in February 2014 and the second in April 2014. The Debtor appeared and participated in both meetings. Following each of the meetings, the Debtor filed amendments to her SOFA and schedules. After the first meeting, the Debtor amended her SOFA to disclose a $2700 payment made to her sister, Therese Trieloff, in November 2013. She also disclosed ownership of a business, Andy's Creations. On an amended Schedule B - Personal Property, the Debtor disclosed several additional bank accounts with minimal balances. In an amendment to her SOFA filed in May 2014, the Debtor listed, for the first time, gambling losses of $4800 in the year preceding her bankruptcy filing. She also amended her Schedule J, disclosing lower monthly car payment amounts of $348.19 and $299.71. In an amendment to her SOFA filed in July 2014, the Debtor disclosed three transfers of $6000 each, which she stated were IRA contributions for tax years 2011, 2012, and 2013.

The Plaintiffs filed a timely complaint objecting to the discharge of the

Debtor and to the dischargeability of the debt owed by the Debtor to them. Subsequently they filed an Amended Complaint. The Amended Complaint contains over one hundred factual allegations common to all counts. Counts I, II, and III seek a determination of the nondischargeability of the debt owed by the Debtor to the Plaintiffs and are not before the Court at this time.

Count IV of the Amended Complaint alleges that the Debtor should be denied a discharge for transferring, removing, destroying, mutilating, or concealing her property with the intent to hinder, delay, or defraud her creditors, within one year before filing her petition. Specifically, the Plaintiffs allege that the Debtor converted non-exempt inherited property into exempt property without disclosing it on her SOFA. Count V of the Amended Complaint alleges the Debtor should be denied a discharge for concealing or failing to keep financial records relating to her Chase credit card, her Bank of America credit card, and her PNC Bank savings account. Count VI alleges that the Debtor should be denied a discharge for making several false oaths on her petition, schedules, SOFA, and at her meetings of creditors. In particular, the Plaintiffs allege that the Debtor made false oaths regarding her gambling losses and spending, her financial accounts, her contemplation and discussion of bankruptcy, her inheritance from her mother, her monthly housing or mortgage payments, her monthly car payments, payments she made to family members, and her net income. Finally, Count VII of the Amended Complaint alleges that the Debtor should be denied a discharge for her failure to explain satisfactorily the loss of assets or deficiency of assets to meet her liabilities.

The allegations in the Amended Complaint largely focus on the Debtor's pre-petition conduct regarding a Wisconsin state court judgment entered against her in 2013. In April of that year, the Dane County Circuit Court of Wisconsin entered an oral ruling, finding against the Debtor and in favor of the Plaintiffs on state law counts of breach of power of attorney, undue influence, and statutory conversion. Plaintiffs are the Debtor's siblings and the alleged wrongdoing involved her conduct related to the finances of their late father. The state court reserved ruling on damages pending further arguments from the parties. In May 2013, the state court entered an order temporarily enjoining the Debtor from "encumbering, concealing, damaging, destroying, transferring, or in any way disposing of property or other assets . . . except to secure necessities." (Ex. P-2.) In October 2013, the court entered the final judgment ("Judgment") against the Debtor, awarding damages and interest to the Plaintiffs in the amount of $719,564.89. The Debtor filed a notice of appeal of the Judgment in November 2013.

The Plaintiffs registered the Judgment in the Circuit Court of Champaign County, Illinois. They then issued a non-wage garnishment against Baird for funds held in the account belonging to the Debtor. Baird was served with the garnishment notice, summons, and affidavit for garnishment on November 15, 2013. (Ex. P-3.) The Plaintiffs also served the Debtor with a copy of the garnishment papers by certified mail. The certified mail receipt indicates on its face that it was signed for by the Debtor's husband on November 23, 2013. (Ex. P-3.) Both the Debtor and her husband contend it was actually received and signed for on November 25th.

On November 25, 2013, the Debtor issued payments from the Baird account to her husband and O'Neil Cannon —one of the firms that had represented her on matters relating to the Judgment and that had agreed to represent her in her appeal — in the amounts of $3400 and $25,000, respectively. (Exs. P-65, 66.) The Debtor also made a payment to Bank of America for $1200 which was never disclosed in any of the amendments to her SOFA. (Ex. P-64.) These payments, along with other withdrawals, reduced the balance in the Baird account to $167.36.

On November 26, 2013, the Debtor was served with supplementary proceedings, commonly referred to as a citation to discover assets, under Illinois law. The citation stated that the Debtor was "prohibited from making or suffering any transfer or other disposition of or interfering with any property not exempt from execution or garnishment belonging to you, or to which you may be entitled or which may hereafter be acquired by you or become due to you."

Baird promptly addressed the Plaintiffs' non-wage garnishment by filing a response stating that the balance in the Debtor's account as of November 15, 2013, was $32,625.08. Nevertheless, Baird apparently allowed the checks issued by the Debtor on November 25th to clear.

In early December 2013, the Debtor moved to dismiss the garnishment proceeding. The Debtor also appeared at a citation hearing in Champaign County and produced several documents, including records for her Baird accounts. The Baird account records showed the Debtor's payments from the account after the garnishment was served, resulting in the Plaintiffs asking to have the Debtor held

in contempt. Before the contempt matters were heard in the state court, however, the Debtor filed her bankruptcy.

At the trial on the Amended Complaint, the Plaintiffs called the Trustee, the Debtor, and the Debtor's husband as witnesses. The Trustee testified regarding the meetings of creditors she conducted and her other activities undertaken in the case. The Trustee said that the Debtor seemed truthful in answering her questions at the meetings in some respects, but that she also seemed evasive at times. Particularly as to questions regarding the Debtor's inheritance from her mother, the Trustee opined that the Debtor clearly did not want to answer directly. The Trustee also testified as to a number of inconsistencies among the Debtor's SOFA and schedules and her testimony given at the creditors' meetings. The Trustee testified that she first learned of the Debtor's gambling losses at the first creditors' meeting. She acknowledged, however, that the losses were subsequently disclosed on an amended SOFA. The Trustee also agreed that the $400 entertainment expense was consistent with the amounts lost to gambling on a monthly basis.

The Trustee testified that she found out about the Debtor's three IRA contributions after the Debtor provided documents following the first creditors' meeting. The Trustee acknowledged that the Debtor amended her SOFA to include those transfers, as well as the pre-petition payment to her sister, Therese Trieloff. The Trustee also testified to discrepancies in the amounts the Debtor claimed to spend on monthly mortgage payments. She said that she learned at the meetings that the Debtor had been making monthly interest-only payments of $161.39 on her home equity loan, not the $400 listed on Schedule J. Despite the various

–7–

inaccuracies, the Trustee admitted that the Debtor ultimately complied with all of her requests to produce documents, notes, and other information. And notwithstanding the Trustee's concerns identified at trial, she never filed an objection to discharge of the Debtor.

The Debtor testified, acknowledging the numerous omissions and inaccuracies in her petition and schedules and admitting that not every mistake had been corrected. The Debtor admitted that prior to the entry of the Judgment, she had more than $200,000 in her Baird account. She testified to using the Baird account regularly to pay her expenses. She admitted that she made IRA contributions using funds from the Baird account, explaining that she did so for tax purposes. The Debtor testified that she regularly paid attorneys fees from the Baird account, and continued to do so even after the temporary injunction was entered by the Wisconsin court. Likewise, she admitted making payments of $25,000 to O'Neil Cannon and $3400 to John Geissal on November 25, 2013. She admitted to speaking with her attorneys at O'Neil Cannon on that day and agreeing to pay a $25,000 flat fee up-front for her appeal of the Judgment. She acknowledged receiving a letter via email from O'Neil Cannon on November 25th memorializing the new fee agreement. She also admitted to sending an email to her financial advisor at Baird on November 25th asking him to call her "asap." According to the Debtor, the reason for the email was that she had received the fee agreement letter from O'Neil Cannon and she needed to speak with her financial advisor about arranging payment from the Baird account.

The Debtor also admitted that she learned about the garnishment issued

on her Baird account at some time on November 25th, although she could not recall the exact time she received the notice. She admitted bringing the garnishment to the attention of her attorneys at O'Neil Cannon and did not deny that the purpose of the new fee agreement was to make sure funds got to her attorneys despite the garnishment. She identified the return receipt for the service of the garnishment signed by her husband and dated November 23rd but claimed that day was a Saturday and that both she and her husband were out of town that weekend. She insisted that the certified mail was actually delivered to her home and signed for by her husband on November 25th.

A significant portion of the Plaintiffs' questioning of the Debtor related to her reasons for filing for bankruptcy relief and the timing of when she first considered filing her petition. The Debtor testified that she filed her case solely because of the entry of the Judgment. She admitted that before the Judgment, she paid her bills regularly and usually in full. The Debtor did not dispute previously testifying that she may have considered bankruptcy as early as 2007 or 2008, but also stated that she had no reason to do so at that time. She did, however, also acknowledge that the family dispute that ultimately resulted in the Judgment began in 2007. The Debtor also did not dispute that she discussed the possibility of bankruptcy with her Wisconsin attorneys in 2011 and 2012, but again stated that she had no reason to file at that time. The Debtor acknowledged that the legal action that resulted in the Judgment was commenced in 2011, but maintained that she had no reason to contemplate filing for bankruptcy at that time because she never thought she would lose the Wisconsin case.

The Debtor testified as to her record keeping and household budgeting practices. She explained her use of lists kept on her refrigerator that she referred to as "fridge notes," upon which she and her husband kept track of the monthly expenses that each paid. She stated that they reconciled their accounts monthly and carried over any amounts owed from one to the other to the following month.

The Debtor testified that in 2009 she and her husband obtained a $50,000 home equity line of credit from PNC Bank.[1] She also testified that the first mortgage made when their home was purchased was paid off in late 2012, leaving only the PNC home equity mortgage as a lien against the home. The Debtor admitted that the $400 monthly house payment shown on her Schedule J did not reflect what she had actually been paying. Instead, she had been making interest-only payments of approximately $161 per month as reflected on the fridge notes. She said that the $400 was the amount that she and her husband were hoping to pay each month to begin to pay down the principal of the debt. And as also reflected on the fridge notes, after filing bankruptcy, she and her husband actually had been making regular monthly payments of $400 or $500. The Debtor also admitted that the amounts listed on her initial Schedule J for monthly car payments were inaccurate, positing that she had accidentally transposed the numbers and explaining that she amended her schedules when the discrepancy was pointed out to her at a meeting of creditors.

The Debtor testified that the fridge notes were not used to track all

---

[1] The mortgage document (Ex. P-53) entered into evidence shows the original lender was National City Bank rather than PNC.

expenses, and those not put on the lists included personal items and gambling expenditures. The Debtor admitted that she did not maintain detailed records of her gambling spending and could not recall exactly how much she had won or lost in a given year, but she testified that she spent about $400 a month on gambling. The Debtor also did not dispute that the temporary injunction order issued by the Wisconsin court had remained in full force and effect since its entry and that it was still in effect at the time of trial. Nonetheless, the Debtor admitted that she had taken out numerous cash advances, totaling over $2000, at Bunny's Tavern for gambling in the weeks prior to filing her bankruptcy. The Debtor admitted that her spending for gambling was excessive, but stated that she was gambling more to deal with stress.

The Debtor also testified as to the conveyance of her home from joint tenancy with her husband to tenancy by the entirety in May 2012. (Ex. P-49.) Although she couldn't remember why they chose to change the ownership interest, she testified that an attorney recommended it when they spoke with him about estate matters and changing their wills. She recalled being under the impression that the home should have been held in tenancy by the entirety from the time of purchase.

The Debtor's husband, John Geissal, testified about the change in ownership of the home, stating that he understood the purpose was to protect him from involvement in the Debtor's legal troubles. Mr. Geissal also testified about the couple's finances, explaining that, other than their joint ownership of the house, all of their assets and liabilities were maintained separately. He

acknowledged the couple's use of the fridge notes to track expenses paid by each

of them. Mr. Geissal testified that the fridge notes were reconciled monthly and

that the $3400 check he received from the Debtor on November 25, 2013, was for

reconciliation of a three month period. He admitted, however, that the check was

the first that he had ever received from the Debtor to settle a reconciliation.

Usually, amounts owed from one to the other were carried over month to month.

At the conclusion of two days of trial, the attorneys provided legal

arguments in support of their respective positions. The matter is ready for

decision.

## II. Jurisdiction

This Court has jurisdiction over the issues before it pursuant to 28 U.S.C.

§1334. All bankruptcy cases and proceedings filed in the Central District of Illinois

have been referred to the bankruptcy judges. CDIL-LR 4.1; 28 U.S.C. §157(a). The

determination of whether a debtor is entitled to a discharge is a core proceeding.

28 U.S.C. §157(b)(2)(J). Disputes regarding the issuance of a discharge stem from

the bankruptcy itself and arise specifically under the provisions of the Code and

therefore may be constitutionally decided by a bankruptcy judge. *See Stern v.

Marshall*, 131 S.Ct. 2594, 2618 (2011).

## III. Legal Analysis

## A. Attorney-Client Privilege Issues

Several days before trial, the Debtor filed a Motion in Limine raising

objections to the admissibility of several documents marked as exhibits by the

Plaintiffs and produced pursuant to this Court's pre-trial order as documents intended to be used at trial. In particular, the Debtor complained that the worksheet she had provided to her attorney when she began her bankruptcy process was now in the possession of the Plaintiffs and was apparently going to be used against her at trial. Although the Debtor admitted through her attorney at the hearing on the Motion in Limine that she had voluntarily produced the worksheet to the Trustee, she asserted that it was subject to attorney-client privilege and should not be admissible. This Court denied the Motion in Limine and held that because the worksheet had been voluntarily produced to a third party without a protective order, any privilege had been waived.

During the trial, the Plaintiffs also introduced billing records from O'Neil Cannon, the attorneys representing the Debtor in the pending Wisconsin case. The billing records had also apparently been provided to the Trustee who had passed them on to the Plaintiffs' attorneys. The Debtor did not object to the admissibility of the billing records during the trial even though the records contained detailed descriptions of the attorneys' communications with the Debtor.

The admission of the worksheet and the billing records raise issues of attorney-client privilege which merit a brief discussion here. This Court has noticed a local practice of case trustees and, occasionally, the United States Trustee ("UST") requesting worksheets and other documents from debtors' attorneys and the wholesale turnover of such documents by debtors' attorneys in response without any apparent consideration of the privilege issues. Indeed, in this case, the Debtor's attorney asserted at the hearing on the Motion in Limine

that he thought he was required to provide whatever documents the Trustee requested but assumed, albeit incorrectly, that the Trustee would then preserve the privileged nature of the documents produced.

The attorney-client privilege has long been recognized to protect confidential client communications. *See Upjohn Co. v. United States,* 449 U.S. 383, 389 (1981). The purpose of the privilege is to allow "full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice." *Id.* An attorney's work-product developed for a client in anticipation of litigation, including the filing of a bankruptcy case, is covered by the broad privilege. *In re Tri State Outdoor Media Group, Inc.,* 283 B.R. 358, 364 (Bankr. M.D. Ga. 2002). Discovery is limited to non-privileged matters. Fed. R. Civ. P. 26; Fed. R. Bank. P. 7026.

When a client communicates with an attorney seeking legal advice, such communications are generally protected by the privilege when there is an intent that the communication has been made and will be kept in confidence. *United States v. White*, 970 F.2d 328, 334 (7th Cir. 1992). In the bankruptcy context, however, when the information provided in the communication is for the purpose of preparing a bankruptcy petition, schedules, and other related documents which will be publicly filed, there may be no intent for the information to be held in confidence. *Id.* And, of course, once the information has been disclosed to third parties, the privilege may be waived. *Tri State*, 283 B.R. at 362.

Billing records are subject to the privilege to the extent such records disclose confidential communications including a client's motivation for seeking

advice. *Matter of Witnesses Before The Special March 1980 Grand Jury*, 729 F.2d 489, 495 (7th Cir. 1984). When it appears billing records may be discoverable in part, an *in camera* review should be requested to prevent confidential information from being disclosed or the records produced should be redacted to protect the privileged information. *Id.*; *Kelley v. LaBrie* (*In re Kelley*), 2003 WL 24144575, at *6 (Bankr. D. Vt. 2003).

Worksheets prepared by debtors for their bankruptcy attorneys' use do not fit squarely in either the privileged or non-privileged category. The style of the worksheets and the instructions given to debtors on filling out the worksheets vary from firm to firm and lawyer to lawyer. Certainly some of the information requested on such worksheets would typically be intended to be publicly disclosed on the schedules and other bankruptcy documents and therefore not be privileged. But the worksheets may also be used by debtors to note questions or issues they properly intend to discuss in confidence with their attorney. Debtors must be free to have full and frank discussions with their attorneys about their assets, liabilities, income, expenses, and other financial issues. Debtors can only obtain accurate legal advice about whether the filing of a bankruptcy will help them meet their desired goals if they are able to share all of their information—including information which could form the basis for an objection to discharge, a complaint to determine dischargeability, or a criminal prosecution—with their attorney. When such information is included on a debtor's worksheet, it would generally have been provided in confidence without any intent that it become part of a public filing, and the privilege would then apply.

Here, it is unclear why the Trustee wanted the Debtor's worksheet in the first place. In this Court's anecdotal experience, it is often the case that when worksheets are requested by a Trustee or the UST, the request is based on a misunderstanding of the conclusions that may be drawn from what appears or does not appear on a worksheet. Actually, limited inferences can be drawn from most worksheets because such worksheets are preliminary drafts subject to review and change, are not prepared under oath, and frequently are not even signed. Blank spaces may be left on a worksheet by a debtor to indicate that there was no information to disclose in response to a question. Alternatively, a section may have been left blank because the debtor had questions about how to respond or provided responsive documents rather than a written answer to a particular question. Often worksheets contain the handwriting not only of the debtor but also of the attorney or clerical staff who interviewed the debtor or later used the worksheet to prepare documents. Debtors must file honest, accurate schedules and other documents in their bankruptcy cases. 11 U.S.C. §521(a)(1); Fed. R. Bankr. P. 1007(b). But there is no requirement that the first draft of such documents or that preliminary worksheets created to facilitate preparation of such documents be pristine. Negative inferences generally should not be drawn simply because preliminary documents never filed with the court are incomplete or contain inaccuracies.

For many of the reasons cited above, this Court found the Debtor's worksheet introduced into evidence over the objection of the Debtor to be of no evidentiary value in the case. Nothing on the worksheet was considered in support

of the Court's decision on the merits of the case. The lesson to be learned,

however, is that the worksheet probably never should have been requested by or

produced to the Trustee. Whatever the Trustee's questions were, they most likely

could have been answered in another way. Or, if only production of the worksheet

would have provided the answer to a relevant question, a protective order or *in

camera* review should have been sought. The Debtor's duty to cooperate with the

Trustee does not specifically require a debtor to waive privilege.[2] 11 U.S.C.

§521(a)(3). Nevertheless, the worksheet was voluntarily produced without

limitation or qualification and therefore the privilege, if any, which could have

protected the document in whole or part was waived. Luckily for the Debtor, the

document contained nothing that the Court considered relevant to the issues

before it.

The Debtor is not so lucky, however, when it comes to the billing records of

---

[2] A separate and distinct issue arises when a trustee claims authority to waive the attorney-client privilege on behalf of a debtor and thereby compel the debtor's attorney to reveal privileged communications. When the debtor is a corporation, the Supreme Court has held that a bankruptcy trustee may waive the debtor corporation's attorney-client privilege over the debtor's objection. *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 356 (1985). The Court made it clear, however, that its holding did not extend to individuals because the theory that it had "embraced" in making its decision related to concepts of corporate management which would not apply to individuals. *Id.* at 356-57. Although several courts have considered the issue of whether a bankruptcy trustee has authority to waive an individual debtor's attorney-client privilege, there is no controlling precedent on that issue. *See In re Miller*, 247 B.R. 704, 709 (Bankr. N.D. Ohio 2000) (collecting cases). An attorney faced with a trustee's assertion that the trustee controls a debtor client's privilege would be wise to object to producing confidential information and to seek a protective order and an *in camera* review before revealing any such information. *Miller,* 247 B.R. at 712-13.

O'Neil Cannon. Those billing records were produced in unredacted form. As will
be discussed in more detail below, the billing records provide strong evidence that,
after the Debtor and her attorneys learned of the garnishment served on Baird,
they had multiple discussions about making a transfer from the Debtor's Baird
account to the attorneys before Baird could turn over the funds to the Plaintiffs.
Although other evidence, such as the Baird account records, shows the timing of
the transfers, the attorney billing records provide the most compelling evidence
of the Debtor's intent to make the transfer to her attorneys in response to the
garnishment. That intent was key to this Court's ultimate finding that the Debtor
must be denied her discharge.

The attorney billing records appear to have been voluntarily produced in
response to a request by the Trustee. The records are included on a list of
documents produced to the Trustee by the Debtor after her initial creditors'
meeting. (Ex. P-54.) It is again unclear exactly why the Trustee wanted the billing
records. What is clear, however, is that the billing records contain confidential
client information. A protective order could have been sought to avoid production
of the requested records or at least to limit production to a redacted version of the
records. No privilege was claimed at trial, and the billing records were properly
admitted. The Debtor's voluntary production of the unredacted billing records of
O'Neil Cannon to the Trustee turned out to be unwise.

In addition to the attorney-client privilege limiting the discovery and
admission of confidential communications, the existence of an attorney-client
privilege imposes an ethical duty on all attorneys involved in a case. The Local

Rules of the Central District of Illinois adopt the Rules of Professional Conduct of the Supreme Court of Illinois to govern local federal practice. CDIL-LR 83.6(D). The Illinois Rules of Professional Conduct impose a strict duty on attorneys to maintain the confidentiality of client information. Ill. R. Prof. Conduct R. 1.6 (eff. Jan. 1, 2010). Debtors' attorneys have a duty to guard their clients' confidences. Equally important, trustees, the UST, and creditors' attorneys must respect the privilege and the ethical obligations of their colleagues. The local practice of trustees and the UST insisting on the production of confidential information and debtors' attorneys assuming that production is required must be seriously reviewed and reconsidered by all involved.

## B. Denial of Discharge

The Amended Complaint contained an abundance of factual allegations, and the Plaintiffs' attorneys appeared at trial with literally thousands of pages of documents marked as potential exhibits. During two days of trial, a significant amount of information about the Debtor's conduct during the years preceding the filing of her bankruptcy was presented. Much of the evidence and testimony, however, was not directly focused on the specific elements necessary to prove the causes of action alleged by the Plaintiffs. Having sorted through the admitted exhibits and reviewed the testimony presented, the Court finds that only one cause of action was proven by the Plaintiffs. That is enough, however, to deny the Debtor her discharge.

*1. The Debtor's November 25, 2013 Transfers - Count IV*

The denial of an individual's discharge is governed by §727(a) which provides, in part:

> (a) The court shall grant the debtor a discharge, unless —
>
> . . . .
>
>> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed —
>>
>>> (A) property of the debtor, within one year before the date of the filing of the petition[.]

11 U.S.C. §727(a)(2)(A).

In order to prevail on an objection to discharge brought pursuant to §727(a)(2)(A), the Plaintiffs must prove by a preponderance of the evidence that (1) the Debtor transferred, removed, destroyed, mutilated, or concealed her property, (2) within one year before filing her bankruptcy petition, (3) with the intent to hinder, delay, or defraud a creditor. *Id.; In re Kontrick*, 295 F.3d 724, 736 (7th Cir. 2002), *aff'd sub nom Kontrick v. Ryan*, 540 U.S. 443 (2004).

The Debtor does not dispute that she made transfers of her property during the one year before filing bankruptcy. In particular, she admits transferring $25,000 to O'Neil Cannon and $3400 to her husband in November 2013 and then filing her bankruptcy just two months later in January 2014. The only disputed issue is whether she made the transfers with the intent to hinder, delay, or

defraud a creditor.

It is not necessary for the Plaintiffs to prove that the Debtor's intent in making the transfers rose to the level of intending to defraud a creditor; proof of the intent to hinder or delay a creditor is sufficient to meet their burden. *Smiley v. First Nat'l Bank of Belleville (In re Smiley)*, 864 F.2d 562, 568-69 (7th Cir. 1989). Hindering a creditor generally refers to conduct that impedes or obstructs a creditor's collection efforts. *Crews v. First Colony Life Ins. Co. (In re Barker)*, 168 B.R. 773, 779 (Bankr. M.D. Fla. 1994). Delaying a creditor would generally involve conduct that postpones a creditor's efforts or puts the effectiveness of those efforts off into the future. *See First State Bank of Bloomington v. Cannell* (*In re Cannell*), 2013 WL 2467787, at *3 (Bankr. C.D. Ill. June 7, 2013), *aff'd* 2014 WL 3725929 (C.D. Ill. July 28, 2014).

The evidence clearly established that the Debtor learned about the garnishment of her Baird account, at the latest, on November 25, 2013. An O'Neil Cannon bill dated January 20, 2014 (Ex. P-68) includes itemized time entries for November and December 2013. On November 25th, three different O'Neill Cannon lawyers spent a combined eight hours of time engaged in multiple conversations with the Debtor and each other "regarding garnishment of Baird account." The attorneys spent time researching Illinois law to determine "the legitimacy of garnishment." The Debtor and her attorneys concluded their discussions that day by entering into a new flat-fee agreement requiring the Debtor's immediate payment of a non-refundable $25,000 retainer. A letter memorializing the new agreement (Ex. P-60) was emailed to the Debtor. The Debtor responded by issuing

a $25,000 check drawn on her Baird account (Ex. P-66) to O'Neil Cannon.

On November 25, 2013, the Debtor also issued a check from her Baird account to her husband for $3400. Both the Debtor and her husband testified that they maintained separate finances and kept track of shared expenses by writing them down on their so-called fridge notes. They both agreed that they reconciled the fridge notes monthly and carried over balances owed from one to the other from month to month. Mr. Geissal acknowledged that, although the $3400 paid to him on November 25th was the balance owed to him at the time according to the fridge notes, he had never before received an actual payment from the Debtor settling their accounts. Neither the Debtor not Mr. Geissal offered any explanation for why the payment was made on the day that it was.

In the midst of her discussions with her attorneys, the Debtor sent an email to her broker at Baird with the subject line "VERY IMPORTANT" asking him to call her "asap." (Ex. P-57.) She admitted that she contacted her broker to make arrangements for her issuance of checks from her Baird account that day.

The only explanation for the urgent flurry of activity by the Debtor on November 25, 2013, is that she wanted to hinder and delay the collection efforts of the Plaintiffs. The Debtor had received notice of the garnishment of her Baird account, and she wanted to use the funds in that account for her own purposes rather than for the payment of the Judgment. On November 25th, she did not owe O'Neil Cannon any amounts for services previously rendered. To the contrary, the revised fee agreement memorialized in their letter (Ex. P-60) includes acknowledgment that the attorneys had $8924.86 in their trust account held on

her behalf. There was no reason to change the fee agreement that day other than the need to spend the Baird funds before they were paid over to the Plaintiffs. The urgency exhibited by the multiple phone calls with her attorneys, the attorneys' demand for immediate payment of an additional non-refundable retainer, and the "asap" request to her broker can only be explained as an attempt by the Debtor to beat the Plaintiffs to the Baird funds. Likewise, the Debtor's payment to her husband that day can only be explained as an effort to draw down the Baird account before the Plaintiffs got the funds. Although the Debtor and her husband had a long history of reconciling their shared expenditures, they had no history of actually settling up with a payment by one to the other, and the date when the one and only payment was made is not coincidental.

Count IV of the Amended Complaint alleged that the Debtor should be denied her discharge because of transfers she made during the year before filing with the intent to hinder, delay, or defraud a creditor. Incorporated in Count IV were the common allegations of the Amended Complaint including the allegations about the November 25, 2013, transfers. Plaintiffs have met their burden of proof on all elements of the cause of action. Judgment will be entered in favor of the Plaintiffs on Count IV, and the Debtor's discharge will be denied.

### 2. The Other Evidence and Counts V, VI, and VII

As stated above, the Plaintiffs' evidentiary presentation at trial was, in large measure, not adequately focused on the specific elements required to meet their burden of proof on the particular causes of action pled in the Amended Complaint.

-23-

Based on a review of the admitted exhibits and the testimony, the Court must find that the Plaintiffs failed to meet their burden of proof on Counts V, VI, and VII of their Amended Complaint. Only a brief review of the evidence is needed to support that finding.

The Trustee testified for the Plaintiffs, and her testimony was helpful in that she provided background for and context to some of the allegations and issues. The Trustee outlined the discrepancies in the Debtor's original filings and discussed her efforts to obtain corrected information and documents in the case. The purpose of the Trustee's testimony was to establish her concerns about the Debtor's compliance with her statutory obligation to cooperate with the Trustee, and the Trustee certainly made it clear that she had concerns about the Debtor. The Trustee also admitted, however, that she conducted two much-longer-than-usual meetings of creditors and that the volume of documents the Debtor produced included significantly more than would generally be required in an ordinary case. The Trustee acknowledged that, ultimately, she obtained all of the information she requested from the Debtor.

Plaintiffs offered the Trustee's testimony in support of their allegations that the Debtor had made false oaths on her petition, schedules, and SOFA and at her creditors' meetings. Additionally, they suggest that the Trustee's testimony supports the allegation that the Debtor failed to satisfactorily explain a loss of assets. But the Trustee's testimony supported neither allegation. The Trustee received all of the information required to be produced. And most importantly, the Trustee never filed an objection to the Debtor's discharge herself. A Chapter 7

trustee has a duty to oppose a debtor's discharge, if advisable. 11 U.S.C. §704(a)(6). If the Trustee really believed that the Debtor's conduct in this case was of the type that warranted denial of discharge, she had a duty to file an objection herself. Her failure to do so suggests that was not her belief.[3]

Plaintiffs also spent a lot of time over the course of the two-day trial questioning the Debtor about when she might have first thought about filing bankruptcy and when she might have discussed the subject with her various attorneys. The Debtor admitted thinking about bankruptcy in 2007 when her family disputes first arose and again in 2011 when the Wisconsin litigation was filed. Obviously, she thought seriously about it after the Judgment was entered in 2013 and when she filed in early 2014. Despite the repeated and lengthy questioning on the topic, however, Plaintiffs never tied any of the Debtor's answers to any wrongdoing or to any of the elements of the alleged causes of action.

There is nothing wrong or inappropriate about an individual such as the Debtor who is facing expensive litigation and potentially a large adverse judgment considering bankruptcy. And there is nothing wrong or inappropriate about

---

[3] No negative inference about the merits of an objection to discharge can or should be drawn simply because the objection is brought by a creditor rather than the trustee. To the contrary, creditors may have more information and better resources than a trustee to prosecute an action. Here, it is a question of the weight to be given to the Trustee's testimony which is at issue. When a trustee decides after extensive investigation that filing an objection to discharge would not be advisable, the weight to be given to that trustee's opinions in support of a creditor's objection must be considered carefully. Although the Court considered the factual testimony of the Trustee and found it helpful, little weight was given to her opinion testimony.

attorneys representing someone in the Debtor's position discussing with their client whether bankruptcy might be an alternative to continued litigation. Plaintiffs never explained the relevance of the testimony they elicited from the Debtor on the issue. They also never tied her contemplation of filing bankruptcy to any of her conduct over the years preceding her actual filing. They asserted that she transferred funds to her IRA several years before filing but the Debtor denied the contributions were in contemplation of a bankruptcy filing, and her testimony in that regard was credible and not rebutted. The Plaintiffs' presentation about the Debtor's consideration of a bankruptcy filing during the years before she actually filed provided no support to their case.

Plaintiffs alleged wrongdoing by the Debtor with respect to her mother's estate. At trial, however, the evidence established that the Debtor's sister was the estate fiduciary and, although there may have been some discrepancies in the accounting presented to other estate beneficiaries, it was the sister, not the Debtor, who bore ultimate responsibility for the mother's estate. Further, the information about the mother's estate was never tied to any of the elements of proof required to prevail on any of the alleged causes of action.

Evidence of the Debtor's gambling at Bunny's Tavern was also presented. The Debtor admitted using her credit card to take cash advances which she then promptly used to "play the slots" at the tavern, and she admitted increased gambling activity in the weeks preceding her bankruptcy filing. But, again, the activity was not tied to any of the alleged causes of action. Although the use of the cash advances might be considered transfers, there was absolutely no evidence

that the gambling was done with the intent to hinder, delay, or defraud a creditor.

The Plaintiffs also raised several issues at trial regarding the Debtor's home. A deed executed and recorded in May 2012 transferring the Debtor's ownership in the home with her husband from joint tenancy to a tenancy by the entirety was entered into evidence. (Ex. P-49.) A mortgage on the home signed by the Debtor and her husband in July 2009 related to their home equity loan was also admitted into evidence. (Ex. P-53.)

Under Illinois law, spouses may own their homes as tenants by the entirety, and such ownership protects the entire property from the creditors of just one of the spouses. 735 ILCS 5/12-112; 765 ILCS 1005/1c. John Geissal testified that he understood the reason an attorney had recommended the transfer to him and the Debtor was to protect his interest in the home from the Debtor's creditors, including the Plaintiffs. Thus, the transfer may well have been made to hinder or delay the Plaintiffs' collection efforts. But the transfer was undisputedly made more than one year before the Debtor filed bankruptcy. The Plaintiffs never explained how the publicly-recorded transfer might be relevant to the allegations of the Amended Complaint.

The Debtor testified that she and her husband took out the home equity line of credit in 2009. She stated, as she apparently had throughout discovery, that some of the funds had been used to pay down credit cards. At trial, Plaintiffs' attorneys had the Debtor look at several documents, including voluminous credit card records they had subpoenaed, in an effort to establish that there was no evidence of any significant pay-down in the Debtor's credit card liabilities in 2009.

But the evidence only showed that no such payments were shown on the documents at the places on the documents where the Plaintiffs' attorneys thought the payments would be shown if the payments had been made.[4] No other inference can or should be drawn from the testimony. And the relevance of the disbursements made by the Debtor and her husband from the 2009 home equity loan was never made clear or tied in any way to the elements of proof required to prevail on the Amended Complaint. Further, the Plaintiffs presented no evidence that any documents had been requested of the Debtor regarding the home equity loan which should have been available and produced but which were not.

In summary, the bulk of the evidence presented by the Plaintiffs, other than

---

[4] The Debtor's pre-trial Motion in Limine also sought exclusion of many of the financial documents Plaintiffs obtained by subpoena. The Debtor complained that the documents obtained by subpoena had not been produced pursuant to her discovery requests and were first seen by her attorneys when marked exhibits were exchanged the week before trial pursuant to this Court's pre-trial order. The Court denied the Motion in Limine finding that although the Plaintiffs were required to serve a copy of any subpoena on the Debtor's attorneys, they were not required to produce all documents received in response to a subpoena absent a specific request for those documents. Fed. R. Civ. P. 45; Fed. R. Bankr. P. 9016. Because the Debtor's request for production did not specifically request the subpoenaed documents, the Plaintiffs had not been required to turn over the documents earlier than they had.

But the Plaintiffs cannot have it both ways. Because they did not turn over a significant volume of their documents until just a few days before trial, they gave the Debtor no meaningful opportunity to review those documents. Thus, the Court draws no negative inference from any inability on the part of the Debtor to discuss the documents. She cooperated fully in answering questions about specific items pointed out by the Plaintiffs' attorneys, but her inability to locate and point out information herself on the documents appeared to be due to a lack of familiarity with the documents. To the extent that was a problem in the Plaintiffs' case, it was one of their own making.

the specific evidence about the November 25, 2013, transfers, was unfocused and never sufficiently developed to sustain a finding that the Debtor should be denied a discharge under the allegations set forth in Counts V, VI, and VII of the Amended Complaint. Accordingly, judgment will be entered for the Debtor on those Counts.

## IV. Conclusion

The Plaintiffs met their burden of proof under Count IV and established that within one year of filing her bankruptcy, the Debtor made transfers to her attorneys and her husband with the intent to hinder and delay collection efforts by the Plaintiffs. Thus, the Debtor must be denied her discharge.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

###